**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DWAINE K. HICKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  09 C 261** |
| **v.** | ) | |
| | ) | |
| **FOREST PRESERVE DISTRICT OF** | ) | **HONORABLE DAVID H. COAR** |
| **COOK COUNTY, ILLINOIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Dwaine K. Hicks, an employee of the Forest Preserve District of Cook County, Illinois

("the District"), claims that the District discriminated and retaliated against him based on his

race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  The

District has moved for summary judgment.  For the reasons that follow, that motion is DENIED.


## FACTS

### *Hicks's Employment as a Maintenance Mechanic*

Hicks is an African American.  He began work with the District as a maintenance

mechanic at the Central Garage on September 1, 2006; he remained in that position until

September 11, 2008, at which time he was relocated and demoted to serviceman II.  (R.53 ¶¶1-

2, 50.)  Hicks's supervisor (at one remove) throughout his employment at the Central Garage

was Thomas Thompson, maintenance supervisor III.  (*Id.* ¶3.)

During the two years that Hicks worked as a mechanic, he received a total of twenty eight

disciplinary write-ups.  (R.53 ¶57.)  In his affidavit, Thompson testified that he took this repeated

disciplinary action against Hicks because, in his judgment, Hicks was an unqualified mechanic who took an inordinate amount of time to complete tasks, failed to diagnose and repair vehicles properly, and falsified his timekeeping records.[1]  (*Id.* ¶¶11, 59; Aff. Thompson ¶¶4,18, Ex.5.)

Hicks, in turn, has consistently complained that Thompson always treated him differently than nonminority mechanics; Hicks's numerous grievances over the course of his employment attest to his dissatisfactions and, most saliently, to his belief that Thompson filed phony disciplinary write-ups in an attempt to railroad him out of his job.  (R.40 ¶8; R.40, Tab 4-E.)

Among Hicks's grievances were the following: he was only allowed to work on trucks, never cars, and only on old clunkers at that (R.40 ¶11; Dep. Hicks at 30:2-5, 44:6-11; Aff. Hruska ¶50); his exclusive assignment to old, shabby vehicles was never taken into account when he was disciplined for requiring excessive time to complete his assignments (R.40, Tab 4-D at 2), nor was the fact that he was relegated to working on the floor while other mechanics were allowed to work on a rack (R.40 ¶12; Dep. Hicks at 29:25-30:2); he had to request that needed parts be ordered, whereas nonminority mechanics could order their own parts (R.40 ¶14; Dep. Hicks at 38:7-20); lastly, Hicks was told by coworkers that nonminority mechanics were often not required to submit daily work reports, whereas his were obsessively scrutinized and compared to his final work orders. (R.40 ¶¶22, 28; Dep. Hicks at 123:15-20; 126:7-10.) Furthermore, Hicks complained that the standards against which he was supposedly judged were never explained to him, leaving him in the dark as to how to do his job.  (R.40 ¶6; R.40, Tab 4-D at 2.)  Nevertheless, Hicks concedes that he was never assigned any task that was not within his duties as a maintenance mechanic.  (R.53 ¶58; Dep. Hicks at 45:19-22.)

---

[1] In his brief, Hicks asks the court to strike Thompson's affidavit because the incomplete copy originally submitted was not notarized and signed.  The court then granted the District leave to file a corrected copy of its Local Rule 56.1(a)(3) statement.  The corrected copy contains Thompson's complete affidavit, so Hicks's request—the first of the "preliminary matters" he raises in his brief—is denied as moot.

### *Hicks's Disciplinary Record*

The County of Cook Personnel Rules govern the disciplinary process against employees accused of improper conduct or poor work performance. (*Id.* ¶¶5-6.) They specify that discipline must generally progress from an oral warning (first offense) to a written warning (second offense) to suspension (third offense) to termination (fourth offense); but for major infractions, which includes falsifying time sheets, time cards, or other records, progressive discipline does not apply. (*Id.* ¶¶7-8.) As a member of Teamsters Local 726, Hicks was subject to the collective bargaining agreement between the District and Local 726, effective January 1, 2005 through December 31, 2008, which entitled members of Local 726 to union representation in any disciplinary proceedings brought against them. (*Id.* ¶¶4, 9; Aff. Sanchez-Bass, Ex.1 § 6.) A Local 726 member who is dissatisfied with discipline administered by the District may grieve the discipline up to and through formal arbitration. (R.53 ¶10.)

The record contains several of Hicks's disciplinary reports,[2] including one dated July 7, 2008, in which Thompson confused Hicks with Gronimo Hernandez, the other minority mechanic in the Central Garage against whom Thompson also appears to have filed numerous, similar disciplinary write-ups. (R.40 ¶17; R.40, Tab 4-J.)

The earliest form in the record is dated December 8, 2006. Thompson cited Hicks for "less than satisfactory" job performance. (R.53 ¶12; Aff. Thompson, Ex.1.) The gist of the complaint was that Hicks needed an unreasonable amount of time to complete the work on

---

[2] In the second "preliminary matter" raised in his brief, Hicks argues that summary judgment must be denied because the record is incomplete. The court disagrees. Hicks filed a motion to compel (R.24), believing that the District had failed to comply with his requests for further documents relating to Hicks's disciplinary record. Judge Schenkier struck the motion and instructed the parties to resolve their discovery issues face to face, and he gave Hicks leave to file a properly supported motion to compel if the issues were not resolved. (R.29.) Hicks has filed no such motion. He cannot escape summary judgment by flouting Judge Schenkier's order—as well as this court's referral order—and raising these issues in his summary judgment brief after the close of discovery.

vehicle M9906 and reported that the vehicle's brakes were fine even though he had not test driven the vehicle because it was "too cold outside."  (*Id.* ¶13-14; Aff. Thompson, Ex.1.)

On June 27, 2007, Thompson again filed a disciplinary report against Hicks for failure to properly diagnose and repair a vehicle, this time garbage truck G200, which had been assigned to Hicks on June 7.  (R.53 ¶¶15-18; Aff. Thompson, Ex.2.)  Hicks spent "several days" repairing the vehicle; the driver who picked it up got as far as the door of the garage before noticing that the truck was not functioning properly and returning it to Hicks.  (*Id.* ¶16.)  The truck was brought to Hicks a total of four times; he worked on it for a total of 177.75 hours.  (*Id.* ¶17.)

On June 23, 2008, Thompson cited Hicks for two infractions, including falsifying records by not accurately recording the time he worked on truck C301.  (*Id.* ¶24; Aff. Thompson, Ex.4.)  The basis for this charge was a disparity in the time Hicks recorded for this assignment on two sets of forms: his daily work reports (daily logs on which mechanics record the time spent on each repair to a given vehicle) indicated that he spent 44.5 hours working on C301, while his work order (a summation of time spent and parts used on a given vehicle) indicated that he worked either 21.75 or 27.75 hours; the second digit is not legible.  (*Id.*; R.53 ¶21, 22, 25; Aff. Thompson, Ex.4.)  The hours a mechanic records for a particular vehicle on these two sets of forms should match.  (R.53, ¶23.)  Hicks maintains that his daily work reports were accurate, and that he was not allowed to review them when filling out his work orders at the completion of a repair job.  (R.40 ¶5, 22; R.40, Tab 4-D at 2.)  C301 was out of service for nearly a month, whereas Thompson believed it should only have required a couple of days to repair.  (R.53 ¶28.)  Thompson also cited Hicks for beginning work on a vehicle without authorization.  (*Id.* ¶29.)

The June 23, 2008 write-ups were the subject of a disciplinary hearing on August 1, 2008, before P. Scott Montgomery.  (*Id.* ¶30; Aff. Thompson, Ex.3.)  Management sought to

have Hicks suspended for two weeks based on these violations. (R.53, ¶31.) Noting that Hicks's disciplinary record included a verbal warning in November 2007 and written warnings in March and April 2008, Montgomery concluded that Hicks should be suspended for three days without pay, which he was. (*Id.* ¶¶32-33; Aff. Thompson, Ex.3 at 2.)

Almost immediately after that, on August 11, 2008, Thompson cited Hicks again, this time for three infractions: "negligence in performance of duties," a major cause infraction; "falsification of employment records or any other county records," also a major cause infraction and the same charge that was presented at the August 1, 2008 disciplinary hearing; and "perform[ing] at less than a satisfactory level in any job classification." (R.53 ¶34-35; Aff. Sanchez-Bass, Ex.4.) The first and third charges concerned Hicks's alleged inability to properly diagnose and repair the vehicles assigned to him. (R.53 ¶36, Aff. Thompson, Ex.5.) As for the second charge, Hicks filed a grievance with the District—in fact, he filed several more-or-less contemporaneous grievances—noting the repeated pattern of charging him with falsifying documents, maintaining that it was Thompson who was "falsifying" documents (namely, the disciplinary reports), and asking for "this petty nonsense to stop." (R.40, Tab 4-E.) The three August 11, 2008 disciplinary write-ups "were never processed to completion." (R.53 ¶37.) After they were filed, Jack Hurley, Hicks' union representative, contacted Carmen Sanchez-Bass, the director of human resources, and asked if anything could be done for Hicks short of termination; Sanchez-Bass said that she would look into it. (*Id.* ¶38.)

### Hicks's Demotion to Serviceman II

On September 9, 2008, Hicks's future with the District was the subject of a meeting at the District's main office. Hicks was present, along with Hurley, Sanchez-Bass, Keino Robinson (senior attorney), Leroy Taylor (maintenance superintendant III), Frank Mole (assistant

maintenance superintendant III), and William Helm (executive assistant to the superintendant).

(*Id.* ¶39.)  Robinson told Hicks that management felt his job performance was unsatisfactory.

(*Id.* ¶41; Dep. Hicks at 93:4-6.)  Sanchez-Bass told Hicks that after reviewing the record of his

job performance, management thought he would be better suited to a serviceman II position.  (*Id.*

at 93:11-94:1.)  Robinson explained Hicks's options: he could take the serviceman II position

and the District would "get rid of the last three write-ups;" or Hicks could refuse the offer and

challenge the write-ups at another hearing, in which case the District would pursue disciplinary

sanctions and "push toward termination."  (*Id.* at 96:10-17; R.53 ¶49.)  Hurley asked to confer

with Hicks outside and advised him, "They are not trying to fire you. . . They are offering you a

way out;" Hicks responded that he needed time to discuss the situation with his wife.  (R.53 ¶45;

Dep. Hicks at 94:18-95:6.)  The District gave Hicks until the following day to respond, at which

time Mole and Rick Bono approached Hicks and asked for his decision.  (*Id.* at 96:20-97:3.)

Hicks responded that the offer was "an insult," but nevertheless accepted, citing the economy

and his need to preserve his insurance.  (*Id.* at 97:19-22.)  Hicks then signed a letter, prepared by

Sanchez-Bass, acknowledging his demotion to serviceman II, effective September 12, 2008.

(R.53 ¶¶48, 50; Aff. Sanchez-Bass, Ex.6.)  His new pay of $20.426/hr was approximately $9/hr

less than he made as a maintenance mechanic, and instead of repairing automobiles, he would

cut grass, trim trees, plow snow, and perform other such "landscaping work."  (R.53 ¶48; R.40

¶13.)  Hicks is still employed as serviceman II and has not received any disciplinary write-ups in

this position.  (R.53 ¶¶60-61.)  The District has taken no further action on any of Hicks's

disciplinary write-ups from his days as a mechanic.  (*Id.* ¶53.)

Thompson was not present at the September 9, 2008 meeting, and he did not discuss with

District management whether he thought Hicks should be offered a serviceman II position.  (*Id.*

¶¶51-52.)  Robinson and Taylor, two members of management who were present at the meeting and participated in the decision to demote Hicks, are African American.  (*Id.* ¶55.)  Neither Hicks's race nor his support for Gronimo Hernandez's complaints against the District were ever raised during management's discussions of Hicks's future.  (*Id.* ¶¶54, 56.)

### Hicks's and Hernandez's Complaints

Gronimo Hernandez was also a maintenance mechanic at the Central Garage.  Hernandez is Hispanic.  In November 2006, he filed an internal complaint, alleging racial discrimination; on February 2, 2007, he filed a complaint against the District with the Cook County Commission on Human Rights, alleging racial discrimination and retaliation.  Both complaints were based on allegations about Thompson's behavior.  (R.40, Tab 4-G.)  Hicks cooperated in the investigation of Hernandez's complaint.  (*Id.* ¶¶ 67-68.)  On November 10, 2007, Hicks filed his own complaint with the Commission, alleging retaliation by Thompson for his cooperation in the Hernandez investigation.  (R.40, Tab 4-F.)  Hicks also filed charges against the District with the EEOC, on September 26, 2008, alleging racial discrimination and retaliation.  (R.40, Tab 4-L.)

### Hruska's Affidavit[3]

On May 29, 2008, Joseph Hruska was hired by the District as a maintenance foreman II at the Central Garage, where he supervised the garage's six mechanics, including Hicks, and in turn reported directly to Thompson.  (Aff. Hruska ¶¶1-8.)  Hruska testified by affidavit that sometime in the last week of May or first week of June 2008, Thompson told him that there were two employees—Hicks and Hernandez—who "needed to be fired" because they had filed

---

[3] As the District points out in its reply brief, Hruska's affidavit contains some sweeping statements that purport to be about Hicks's job performance generally, even though Hruska was only employed by the District for roughly the final three months of Hicks's tenure as a mechanic.  The court will construe such claims by Hruska as confined to the period when he and Hicks both worked at the Central Garage, i.e., from May 29, 2008 to September 5, 2008, when Hruska was fired.  As for the District's attack on Hruska's credibility, that is a matter for a jury, not this court, to resolve.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

charges of discrimination against him. (*Id.* ¶13; R.40 ¶31.) Hruska further testified that Jim Wagner (superintendant) and Richard Bono (manager) also told him, on multiple occasions, that the District wanted to "get rid of" Hicks and Hernandez for filing charges against the District. (*Id.* ¶30-31; Aff. Hruska ¶¶11-15.)

Hruska also testified in his affidavit that Thompson instructed him to "document any move that Hicks and Hernandez made," but that Thompson did *not* want him to document any other mechanics' errors. (R.40 ¶¶19-20; Aff. Hruska ¶¶29-30, 33, 38.) Hruska had to spend "an inordinate amount of time" assembling disciplinary reports against Hicks and Hernandez at Thompson's behest. (*Id.* ¶¶22-23, 35.) Pursuant to Thompson's instructions, Hruska assembled ten to fifteen reports against Hicks, and Thompson completed the process of filing them, since union rules prohibit Hruska from disciplining other union members. (*Id.* ¶¶ 17, 32, 33.) Hruska never believed that the content of these reports was "accurate or factual." (*Id.* ¶24.) On the contrary, he always found Hicks's work satisfactory and timely, and he often witnessed District employees (including Carl Lewis, Kevin Mason, and Dave Dement) compliment Hicks's repair work. (*Id.* ¶¶19, 36, 37.) Hruska assembled reports that he believed to be untruthful because he believed that he would lose his job if he did not do as Thompson asked. (*Id.* ¶34.)

Additionally, Hruska testified that, during his tenure as foreman, Hicks and Hernandez were never allowed to review their daily work reports when filling out their final work orders (R.40 ¶21; Aff. Hruska ¶41) and that, to his knowledge, Thompson never compared the daily work reports and final work orders of any mechanics other than Hicks and Hernandez. (*Id.* ¶43.)

## SUMMARY JUDGMENT STANDARD

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

The nonmoving party, in turn, may not rest on the allegations in his pleadings or conclusory statements in affidavits; he must support his contentions with evidence that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). To avoid summary judgment, the nonmovant must do more than raise a "metaphysical doubt" as to the material facts. *See Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted). And "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## ANALYSIS

### *Discrimination*

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff can prove discrimination through the direct or indirect methods outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or he can combine both approaches. *Simple v. Walgreen Co.*, 511 F.3d 668, 670-71 (7th Cir. 2007). No matter what path he chooses, the basic question is whether his employer discriminated against him based on a protected ground. *Id.* at 671.

The distinction between the direct and indirect methods of proof is often "vague," since a plaintiff may, and often does, present circumstantial evidence of discrimination under either method. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008). Hicks at least nominally proceeds under both methods, and given the facts of this case, the distinction between the two is at best minimal. The parties' briefs, however, focus primarily on the indirect method, so the court follows suit, returning briefly to the direct method at the end.

Under the indirect method, the burden is on Hicks to make out a prima facie case of discrimination by showing that (1) he is a member of a protected class (2) who suffered an adverse employment action (3) despite the fact that he was meeting the District's legitimate employment expectations, and that (4) the District treated similarly situated employees who were not part of his protected class more favorably. *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009). If he can do so, the burden of production shifts to the District to offer a permissible, nondiscriminatory reason for the adverse employment action. *Id.* If it does, the burden shifts back to Hicks to show that the stated reason is merely a pretext for discrimination, i.e., a lie. *Id.* The pretext analysis focuses on whether the reason was honest and not whether it was accurate or wise. *Id.* Notwithstanding these shifting burdens, Hicks bears the ultimate burden of persuading the trier of fact that the District intentionally discriminated against him on the basis of his race. *Id.*

The court begins with the most pivotal, and most hotly contested, issue in this case: whether Hicks was meeting the District's legitimate employment expectations. An employer's *legitimate* employment expectations are simply the employer's *bona fide* expectations, "for it is no business of a court in a discrimination case to decide whether an employee demands 'too much' of his workers." *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997).

Often, then, the question whether an employee lived up to legitimate expectations focuses on the same circumstances as the question of pretext. Central to Hicks's discrimination claim is his allegation that Thompson's disciplinary reports were a put-up job—that is, that the District's ostensible evidence that Hicks was *not* meeting the District's expectations is pretextual and hence establishes nothing. To that extent, the questions of legitimate expectations and pretext merge, so the court can address them in the same breath.[4] *See, e.g.*, *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001). But that does not relieve Hicks of the burden of establishing his prima facie case. *See Coco*, 128 F.3d at 1179-80.

As the District points out, many of Hicks's attempts to raise a question of material fact as to whether he met the District's legitimate expectations fail, since the "facts of the particular vehicles Dwaine was working on" are not material to this issue, whatever or however disputed they may be. Whether the vehicles he worked on were old or new, rusted or in good condition; whether he worked on the floor or on a rack; whether schematics were available; and so forth— these questions do not probe whether the District honestly believed that Hicks was living up to the demands of his position, and it is not the court's role to inquire whether expectations of Hicks were too high. Even if it were, Hicks admits that his assignments were all within the bounds of normal expectations for maintenance mechanics. (R.53 ¶58; Dep. Hicks at 45:19-22.) This admission also dooms Hicks's arguement that the District disparately applied its bona fide expectations. *See Faas*, 532 F.3d at 642 (plaintiff can satisfy legitimate-expectations element of prima facie case by showing that employer's expectations were disparately applied).

Although most of Hicks's arguments are misguided, he has produced evidence from

---

[4] Typically, courts take up these merged issues under the pretext analysis rather than under the legitimate expectations element of the plaintiff's prima facie case. But the court will draw on these issues in the context of the similarly-situated element, so it is more efficient to address them here. Nothing beyond convenience turns on this slight departure from normal practice.

which a reasonable jury could infer that the District did not believe his performance was unsatisfactory. Hruska testified by affidavit that Thompson specifically instructed him to assemble disciplinary reports relating to Hicks (as well as Hernandez, the other minority mechanic in the Central Garage) based on information that Thompson fed to Hruska, reports which Hruska—Hicks's foreman, thus his direct supervisor—did not believe were "accurate or factual." (Aff. Hruska ¶¶22-24, 29-30, 35.) Hruska also testified that Thompson instructed him *not* to assemble disciplinary reports against any mechanics other than Hicks or Hernandez when they made mistakes. (*Id.* ¶38.) Moreover, Hruska testified that while he was foreman, Hicks's work was always timely and up to snuff; he witnesses several other District employees compliment Hicks's repair work, too. (*Id.* ¶¶36-37.) In short, Hruska's testimony speaks directly to the question whether Thompson manufactured phony disciplinary reports against Hicks. If so, the District's ostensibly voluminous evidence that Hicks was failing to perform is unmasked as a lie in one fell swoop. Whether Hicks was meeting legitimate expectations therefore turns, in large measure, on the question of which witness to believe: Hruska or Thompson. That is just to say that Hicks has raised a genuine issue of fact for a jury to resolve. Indeed, "because employment discrimination cases often turn on questions of intent and credibility, courts in these cases must take care as they weigh summary judgment motions not to invade the province of the factfinder by attempting to resolve swearing contests and the like." *Giannopolous v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

The District points out that Thompson generated an extensive disciplinary record against Hicks before Hruska was hired, and that Hicks's performance at that time was obviously beyond the scope of Hruska's personal knowledge. True, but this does not defeat Hicks's prima facie case. A juror who credited Hruska's testimony would not be obliged to believe that the put-up

job only began once Hruska arrived on the scene. That would be serendipitous, to say the least, given that Thompson was there all along, filing disciplinary reports that leveled the same brand of allegations time and again. In any event, the District's adverse action against Hicks (as discussed in more detail below) was predicated on three disciplinary reports that *were* filed during Hruska's tenure; but for those reports, Hicks would not have been forced to choose between a demotion or facing disciplinary proceedings that could have resulted in his termination.[5] Hicks has therefore raised a genuine question of material fact as to whether he was meeting the District's bona fide expectations at the time of the adverse action taken against him. *See Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009). And that is because he raised a genuine question of material fact as to whether Thompsons' disciplinary reports—hence the District's proffered nondiscriminatory reason for his demotion—were pretext. So if he can make out the rest of his prima facie case, he will avoid summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.")

Next, Hicks must establish that the District took an "adverse employment action" against him. The purpose of this flexible requirement is "to distinguish between material differences and the many day-to-day travails and disappointments that, although frustrating, are not so central to the employment relation that they amount to discriminatory terms or conditions." *See Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006). Thus, the employer's action must be

---

[5] This point renders irrelevant the District's argument that three disciplinary write ups from before Hruska's days as foreman were put before Montgomery in his capacity as an "independent Hearing Officer." But the court notes in passing that this argument would fail anyway, for reasons discussed below in connection with the adverse-employment-action requirement. Briefly: prefixing the label 'independent' to Montgomery's job title does not show that he came to any independent determination of the facts or that he did anything more than rubber stamp Thompsons' disciplinary write-ups against Hicks.

"materially adverse . . . meaning more than a mere inconvenience or an alteration of job responsibilities." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 (7th Cir. 2001) (citation and quotation marks omitted). A materially adverse employment action might involve diminishing an employee's "compensation, benefits, or other financial terms of employment;" shifting an employee's function in a way that "significantly reduces his career prospects by preventing him from using the skills in which he is trained and experienced;" or subjecting an employee to workplace conditions that "can fairly be characterized as objectively creating a hardship," due to being "humiliating, degrading, unsafe, unhealthful, or [involving some] otherwise significantly negative alteration." *See Tart v. Ill. Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004).

The District is correct that many of the actions Hicks cites in his complaint are not materially adverse. (Compl. ¶21.) Negative evaluations are not actionable on their own. *Oest*, 240 F.3d at 615. Improper notice of hearing dates did not cause him any more than a "mere inconvenience." Dragging him to a hearing under the guise of dropping off a vehicle might have been condescending or obnoxious, but was not materially adverse. The only materially adverse employment action in Hicks's litany of complaints is his demotion, but that is more than enough to make out his prima facie case: Hicks took a substantial pay cut of roughly $9/hr (down to $20.426/hr) and had to shift from the skilled labor of a mechanic to the unskilled labor of cutting grass and shoveling snow, to the detriment of his future career prospects.

The District responds that Hicks "voluntarily accepted" his demotion; thus, it cannot be an adverse employment action. In support of this conclusion, the District relies on *Carr v. United Airlines*, 2005 U.S. Dist. LEXIS 14538 (N.D. Il., July 15, 2005) (Pallmeyer, J.). Carr had recently been promoted from Ramp Service Worker (a wage laborer) to Ramp Supervisor (a management position) when United declared bankruptcy and initiated various cost-saving

measures, including furloughs and layoffs that affected management positions in Ramp Service.
*Id.* at *2. Under the applicable collective bargaining agreement, recently promoted management
employees with sufficient seniority in their hourly positions were entitled to return to those
positions to avoid being furloughed or laid off from their new jobs in management. *Id.* To avoid
that risk, Carr preemptively volunteered to return to his hourly position. *Id.* His voluntary
demotion was not an adverse action and thus did not support a discrimination claim, even though
several nonminority employees with less seniority and inferior qualifications wound up retaining
their management positions in Ramp Service. *Id.* at *14-15.

The District's analogy between Hicks and Carr is specious. Carr voluntarily returned to
his old position in order to avoid the risk of losing his job pursuant to a race-neutral policy, and it
hardly bears mention that United's bankruptcy restructuring was not a ruse designed to paper
over a discriminatory employment action against him. In stark contrast, Hicks has raised a
question of material fact as to whether the disciplinary proceedings the District threatened to
pursue, and which could have cost him his job, were race neutral—precisely because he has
raised a question of material fact as to whether they were honest. *See Reeves*, 530 U.S. at 148.
*Carr* therefore provides no support for the District's position.

The District further argues that Hicks's demotion was voluntary because "he was not
required to accept the Serviceman II position." (R.53 ¶49.) He could take his chances and
contest the disciplinary write-ups before a Hearing Officer, who would make the final
determination whether to fire him: if he prevailed at the hearing, he would keep his job; if he
lost, he would be fired. Thus, he must have accepted the demotion in trade for the District's
agreement not to pursue the pending write-ups or to seek termination, "based on his assessment
of his likelihood of success in the disciplinary process."

Hicks, however, believed he was going to be fired (R.40 ¶29) and there is a genuine question whether, under the circumstances, that belief was reasonable. "When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002). The standards for constructive discharge also apply to constructive demotion. *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999). There is no dispute that the District would have pursued termination if Hicks had insisted on challenging Thompson's latest write-ups in a hearing. Hicks was no stranger to that process: on August 1, 2008, Hicks appeared before "independent Hearing Officer" P. Scott Montgomery to contest the disciplinary write-ups Thompson had filed against him on June 23, 2008. (Aff. Sanchez-Bass, Ex.3.) Montgomery's report from that hearing is very telling in the present context.

The report gives no indication that Montgomery conducted any investigation of his own; it does, however, show that he relied heavily on the say-so of District management, including Thompson. *See Metzger v. Ill. State Police*, 519 F.3d 677, 682 (7th Cir. 2008) ("[W]here a decision maker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the decision, the employer is not liable for an employee's submission of misinformation.").[6] In particular, Montgomery deferred to Thompson's write-ups against Hicks as a matter of course. Montgomery explained that this was "a case of the veracity of the grievant vs. management" and that "[i]n most instances of this nature, notwithstanding compelling evidence to counter the charge(s), the word of management

---

[6] Significantly, there is also no evidence that any participants in the September 9, 2008 meeting—at which Hicks was offered the choice of a demotion or facing another hearing before an "independent Hearing Officer"— conducted any independent investigation or that their review of Hicks's work performance extended beyond a review of Hicks's disciplinary record, which was of course prepared by Thompson.

is given some weight over that of the grievant." (*Id.* at 2.) Even on a charitable interpretation of what must be a lexical blunder by Montgomery—the court reads 'notwithstanding' as 'in the absence of'—Hicks could reasonably believe that hearing officers routinely defer to whatever management says in the absence of "compelling evidence," which an employee is left to drum up on his own. Moreover, as the District itself points out in its Local Rule 56.1 statement, the write-ups pending at the time included the same charge of falsifying work orders that had been put before Montgomery about one month earlier. (R.53 ¶35.) A jury could conclude that Hicks had no reason to believe that a hearing officer would do anything but defer to Thompson's write-ups the second time around. It could therefore conclude that, under the circumstances, Hicks reasonably believed his termination was imminent and only awaited a rubber stamp. Then again, it might be satisfied that Hicks would have had a fair shake at a second hearing, which would show that his decision to forego the hearing and accept his demotion was truly voluntarily. The need for this fact-intensive inquiry into the circumstances surrounding Hicks's demotion shows that there is a genuine issue as to whether his demotion was an adverse action by the District.

Finally, Hicks must show that the District treated similarly situated nonminority employees more favorably than they treated him. Hicks's discussion on this score is perfunctory, but the District mounts no challenge to it. Still, the burden remains on Hicks to put up the evidence needed to establish his prima facie case.

The similarly-situated requirement applies in an unusual way in this case. Generally, "in disciplinary cases—in which a plaintiff claims that he was disciplined more harshly than a similarly situated employee based on some prohibited reason—a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." *Peirick v. Indiana Univ.—Purdue Univ. Indianapolis Athletics Dept.*, 510 F.3d 681, 689 (7th Cir. 2007) (quoting

*Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). This typically involves showing that employees shared the same supervisor, performance standards, and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Peirick*, 510 F.3d at 689 (quoting *Radue*, 219 F.3d at 617). That said, the similarly-situated requirement should not be applied "mechanically or inflexibly." *Peirick*, 510 F.3d at 689.

In most disciplinary cases, a plaintiff claims that the employer failed to dispense roughly equal discipline to at least one other employee outside the plaintiff's protected class when that employee was charged with performance deficiencies or misconduct roughly comparable to the plaintiff's own job-related failures. Thus, the plaintiff typically admits to misconduct or a goof-up of some sort while on the job[7]—and the onus is then on him to identify at least one other employee outside the protected class whose own goof-up or misconduct was similar enough in all material respects to fund a reasonable inference that the disparate treatment was based on the protected ground. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd* 128 S. Ct. 1951 (2008). But Hicks does not claim disparate punishment for substantially similar failures—he does not admit to those failures, at least not the ones alleged by Thompson, in the first place. It would make no sense to require Hicks to name nonminority employees who were demoted or otherwise disciplined for the kinds of failures alleged in Thompson's disciplinary write-ups when Hicks claims that those write-ups are a pack of lies. Such employees would not be similarly situated; nor would their discipline, no matter how severe, tend to show that Hicks was not discriminated against, since the discrimination he alleges is not a matter of disparate punishments. Rather, the similarly situated employee would be a nonminority maintenance mechanic in the Central Garage under Thompson's supervision who performed to the District's

---

[7] After a concerted effort, the court has been unable to locate a disciplinary case in this circuit in which this is not so.

bona fide expectations and was not forced into a demotion, or something comparable, by phony disciplinary write-ups.  But that is just to say that, under the particular circumstances of this case, the similarly-situated and legitimate-expectations requirements are at bottom the same inquiry: each one asks whether Hicks has produced enough evidence for a jury to conclude that Thompson manufactured a disciplinary record that provided the ostensible grounds for an adverse action against Hicks.  Hicks was therefore correct to assert that these two requirements of his prima facie case merge, even though his own terse treatment of the point is mystifying.  In any case, Hruska's affidavit testimony fills this evidentiary role, for the reasons already put forth. Hicks has put up the evidence he needs to avoid summary judgment on his discrimination claim.

Hicks also emphasizes a suspicious disciplinary report dated July 7, 2008, in which Thompson interchanges Hicks and Hernandez: he filled in Hernandez's name but went on to provide a narrative about Hicks, charging him again with falsifying timekeeping records.  (R.40, Tab 4-J.)  A jury could surely see this as an innocent slip of the pen.  But when viewed in the light most favorable to Hicks, and in the context of all the circumstantial evidence available, this fishy document underscores Thompson's pattern of repeatedly filing nearly identical disciplinary reports against the two minority mechanics in the Central Garage (and the two employees who had filed discrimination charges against the District naming Thompson as the alleged offender). Coupled with Hruska's affidavit testimony that Thompson enlisted him to help fabricate disciplinary write-ups against Hicks (and Hernandez), a jury could find that Thompson set out to railroad the minority mechanics in the Central Garage.  That is enough circumstantial evidence for Hicks to avoid summary judgment when proceeding under the direct method of proof.

### *Retaliation*

The anti-retaliation provision of Title VII of the 1964 Civil Rights Act, 42 U.S.C.

§ 2000e-3(a), prohibits employer actions that "discriminate against" an employee because he has "opposed" practices that Title VII forbids or because he has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." A plaintiff alleging retaliation can prove his case either by the direct method of proof or by a modified version of the indirect method of *McDonnell-Douglas*, 411 U.S. 792. *Metzger*, 519 F.3d at 681.

Hicks has sufficient evidence to proceed under the direct method. To prevail, he must show either through direct or circumstantial evidence that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) there was a causal connection between the two. *Id.* (citations omitted). Hicks has already established an adverse action in connection with the parallel requirement in his discrimination claim. Thus, the court focuses discussion on the first and, especially, the third elements of his retaliation claim.

Hruska testified in his affidavit that during his first week on the job, Thompson told him that Hicks (and Hernandez) "needed to be fired" because they had filed discrimination charges naming him as the offender. (R.40 ¶31, Aff. Hruska ¶13.) Hruska also testified that Jim Wagner (superintendant) and Richard Bono (manager) told him on multiple occasions that the District wanted to "get rid of" Hicks (and Hernandez) for filing discrimination charges against the District. (R.40 ¶¶30-31; Aff. Hruska ¶¶11-15.) Hicks filed a discrimination complaint with the Cook County Commission on Human Rights on November 7, 2007 (R.40, Tab 4-F), to say nothing of his cooperation in the investigation of Hernandez's complaints. (R.53 ¶¶67-68.) There is no question that these are both protected activities under Title VII.

On the basis of this testimony, a reasonable jury could conclude that the District retaliated against Hicks. The District responds that Hruska's affidavit establishes nothing because it purports to show that Thompson and others wanted to "fire" or "get rid of" Hicks; it

does not purport to show that anyone wanted to *demote* Hicks. But the District does not explain why evidence of retaliatory animus coupled with an adverse employment action would not be enough; in particular, it does not explain, or cite any authority for, its implicit assumption that evidence of retaliatory animus must bespeak a commitment to the precise adverse employment action (here, demotion) ultimately taken. The court discerns no reason why that should be so.

Next, the District argues that the third element of Hicks's retaliation claim—the causal connection between his protected activity and the adverse employment action against him— "fails principally because of the lack of temporal proximity between Hicks's alleged involvement in his co-workers' [sic] complaint in November 2006 and Hicks' demotion in September 2008." As an initial matter, the District misconstrues the relevant time frame by ignoring Hicks's November 2007 complaint to the Cook County Commission on Human Rights. This is protected activity for Title VII purposes; it is also identified by Hruska as the alleged basis for retaliation against Hicks. (Aff. Hruska ¶¶13, 15.) Thus, the question is whether, in light of all the available evidence, the interval of November 2007 to September 2008 is too long as a matter of law to support a retaliation claim.

Temporal proximity is a relevant, indeed an important, factor in evaluating retaliation claims, but there are few if any bright-line rules to apply. Rather, "[t]he facts and circumstances of each case necessarily must be evaluated to determine whether an interval is too long to permit a jury to determine rationally that an adverse employment action is linked to an employee's earlier complaint." *Oest*, 240 F.3d at 616. "The inference of causation weakens as the time between the protected expression and the adverse action increases, and then additional proof of a causal nexus is necessary." *Id.* (citation and quotation marks omitted). Thus, when a long time has elapsed, a plaintiff must point to "additional circumstances [to] demonstrate that an

employer's acts might not be legitimate." *Id.* (citation omitted). At the same time, "speculation based on suspicious timing alone does not support a reasonable inference of retaliation; a causal link, again, is required." *Id.* (citation and quotation marks omitted).

One clear implication of *Oest* and other Seventh Circuit cases cited by the District is that a long interval between an employee's complaint and an adverse employment action will defeat the employee's claim when there is no direct evidence of retaliation. But the District purports to find a much stronger rule in the cases, namely, that a long interval between a complaint and an adverse action defeats an employee's retaliation claim *per se*, no matter how the rest of the evidence shapes up. Perhaps the District believes that only *swift* retaliation is actionable under Title VII; perhaps it believes that revenge, as it were, is a dish that *cannot* be served cold. This is not the law, and it is not the conclusion reached in any of the Seventh Circuit cases the District cites—not one of which features a plaintiff who put up any direct evidence of retaliation.[8] Hicks's retaliation claim is, in this crucial respect, readily distinguished from all the authority cited by the District.

True, the inference of retaliation against Hicks might ultimately be weakened by the ten-month interval between his complaint and his demotion, but it is for a jury to say to whether—and if so, to what extent—that is the case. For that is just the question of how much weight, if any, to give Hruska's testimony. The District's *per se* rule, in contrast, would have the

---

[8] *See Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000) ("That interval ["nearly a full year"], *standing alone*, is too long for the timing of Ms. Paluck's firing to raise an inference of discrimination."); *Sauzek v. Exxon Coal USA*, 202 F.3d 913, 918-19 (7th Cir. 2000) ("Plaintiffs *do not cite any evidence that connects* Exxon's refusal to recall them to their filing of EEOC charges . . . "); *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999) ("Filipovic *has not presented any direct evidence* of a causal connection between [his filing of EEOC charges and his termination].); *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) ("Adusumilli has failed to show that she was fired in retaliation for her complaint rather than for her inability to do her job well."); *Davidson v. Midelfort Clinic*, 133 F.3d 499, 511 (7th Cir. 1998) ("The fact that Davidson's discharge occurred after she filed her charge with the EEOC does not *by itself* suggest a causal relationship between these events."); *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) ("The timing of the complaints, *standing alone*, does not create a genuine issue as to a causal connection between the filing of Juarez's sexual harassment complaint and her termination almost six months later.") (all emphases added).

extraordinary consequence that Hruska's testimony is discredited and must be ignored as a matter of law. That is patently incorrect. Hicks has put up enough direct evidence of retaliation to avoid summary judgment. There is no need to take up arguments under the indirect method.

## <u>CONCLUSION</u>

For the foregoing reasons, the District's motion for summary judgment is DENIED.


Enter:

/s/ David H. Coar

_____

David H. Coar

United States District Judge

**Dated: December 15, 2009**